UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL AND MEDICAL CENTER, *et al.*[1] | ) | Case No. 21-01805 |
| | ) | |
| | ) | Hon. Timothy A. Barnes |
| Debtors-in-Possession. | ) | |
| | ) | (Jointly Administered) |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO USE
CASH COLLATERAL ON A LIMITED BASIS, (II) GRANTING
ADEQUATE PROTECTION, AND (III) GRANTING RELATED RELIEF**

This matter came to be heard on the *Debtors' Motion for Entry of Interim and Final Orders*

*(I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C.*

*§§ 362 and 364(c), (II) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to*

*11 U.S.C. §§ 364 and 507, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule*

*4001 and Local Bankruptcy Rule 4001-2* [Docket No. 9] (the "Motion") filed by Mercy Hospital

and Medical Center ("Mercy Hospital") and Mercy Health System of Chicago ("Mercy System"

and, together with Mercy Hospital, the "Debtors") in these chapter 11 cases (the "Chapter 11

Cases"), requesting entry of an interim order and a final order (the "Final Order") pursuant to

sections 105, 362, 364(b), and 364(e) of title 11 of the United States Code (as amended, the

"Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the

United States Bankruptcy Court for the Northern District of Illinois (as amended, the "Local

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal identification number
are: Mercy Hospital and Medical Center (0152) and Mercy Health System of Chicago (3327).

Bankruptcy Rules") authorizing the Debtors to obtain postpetition financing from Trinity Health Corporation, an Indiana nonprofit corporation.

On February 11, 2021, the Court conducted a hearing (the "Interim Hearing") to consider interim approval of the Motion and pronounced such interim approval on the record at the Interim Hearing and as set forth in the *Interim Order Authorizing the Debtors to (I) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 362 and 364(c) and (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2* [Docket No. 113] (the "Interim Order").

Subsequent to the Interim Hearing and entry of the Interim Order, after further assessing their liquidity needs, the Debtors determined that they had sufficient liquidity to fund their ordinary course operations and the administration of these Chapter 11 Cases without the need for the loans under the DIP Facility, and did not draw any amounts under the DIP Facility.

On March 23, 2021, the Court conducted a continued hearing on the Motion (the "Second Interim Hearing") and entered an order amending the Interim Order [Docket No. 116] (the "Second Interim Order"). As set forth in the Second Interim Order, notwithstanding anything in the Motion, the Interim Order, or the DIP Loan Documents (as defined in the Motion), the DIP Facility was terminated in all respects and the DIP Loan Documents are void and of no effect. Further, any and all rights and protections granted to Trinity Health Corporation as the proposed DIP Lender (as defined in the Interim Order) under the Interim Order were vacated in all respects by the Second Interim Order.

On March 30, 2021, the Court conducted a further continued hearing on the Motion (the "Third Interim Hearing") and entered an order further amending the Interim Order [Docket No. 135] (the "Third Interim Order").

US 7772290v.21

Based upon the Court's review of the Motion and statements made on the record at the Interim Hearing, the Second Interim Hearing, the Third Interim Hearing, and the final hearing held before this Court on April 6, 2021 to consider entry of this Final Order (the "<u>Final Hearing</u>"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Bankruptcy Rules, notice of the Motion and the Final Hearing having been given; and it appearing that approval of the final relief set forth herein is fair and reasonable and in the best interests of the Debtors, their creditors and their estates; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      <u>Disposition</u>.  The Motion is granted as set forth herein.

2.      <u>Opportunity to Object</u>.  Pursuant to the Interim Order, as amended by the Third Interim Order, any party objecting to any of the provisions of the Interim Order was required to file a written statement setting forth the basis for such objection with the Court and concurrently served so as to be received on or before April 2, 2021.[2]  If any party in interest shall have an objection to any of the provisions of this Final Order, such party must assert such objection no later than 5:00 p.m., prevailing Central Time, on the date that is ten (10) business days following service of this Final Order, and any such objection that is timely filed shall be heard at the next scheduled omnibus hearing or at such earlier date as may be requested by the Debtors, the Committee, or the Secured Parties, subject to the Court's availability.  After such date, this Final Order shall be binding upon any party in interest that has not timely filed an objection, subject to the provisions of Paragraph 42 hereof.

---

[2] Such deadline was extended by agreement for the Committee to April 5, 2021.

3.    <u>Sufficient Notice</u>.  Notice of the Motion and the Final Hearing has been given pursuant to Bankruptcy Rules 2002, 4001, 9006, and 9014 and the Local Bankruptcy Rules, and as required by sections 102, 105, 361, 362, and 363 of the Bankruptcy Code.

4.    <u>Debtors' Stipulations.</u>  Subject to the Challenge Procedures set forth below in Paragraph 26 of this Final Order, the Debtors admit, stipulate and agree as follows:

      a.  <u>The Secured Parties' Claims</u>.  Pursuant to the Secured Party Loan Documents (as defined below) and applicable law, Prudential Huntoon Paige Associates, LLC and its affiliates (collectively, "<u>Prudential</u>") and the Secretary of Housing and Urban Development ("<u>HUD</u>," each a "<u>Secured Party</u>" and HUD and Prudential together, the "<u>Secured Parties</u>") held valid, enforceable, and allowable claims against Mercy Hospital[3] as of the Petition Date in an aggregate amount equal to at least $23,967,848.90 for unpaid principal, plus any and all interest, real estate taxes, insurance, fees, costs, and expenses, including reasonable attorneys' fees and related expenses, and other claims, debts or obligations of Mercy Hospital to the Secured Parties that have accrued as of the Petition Date under the Secured Party Loan Documents and applicable law (together with all post-Petition Date interest, fees, costs, and charges that may be allowed to the Secured Parties on such claims pursuant to section 506(b) of the Bankruptcy Code, collectively the "<u>Secured Parties' Claims</u>").

---

[3] To the extent any Cash Collateral (as defined below) is in or becomes under the possession, custody, or control of Mercy System, the terms and provisions of this Final Order shall apply to Mercy System and such Cash Collateral in all respects to ensure the adequate protection, rights, and remedies of the Secured Parties.

b.  The Secured Parties' Claims constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of and claims against Mercy Hospital, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors and their estates do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Secured Parties' Claims.

c.  <u>The Secured Party Loan Documents</u>.  The Secured Parties' Claims are evidenced by certain documents executed and delivered to the Secured Parties by Mercy Hospital, including, without limitation, that certain Mortgage Note and Allonge #1, both dated as of June 1, 2011 by Mercy Hospital in favor of Prudential in the original principal amount of $32,414,000 (as amended by the Allonge #2 (as defined below)[4] and as further amended, restated, supplemented, or otherwise modified, the "<u>Construction Note</u>") with a total sum of $29,280,600 approved for insurance thereunder by HUD on June 30, 2014 pursuant to Section 242 of the National Housing Act (12 U.S.C. 1715z-7) and the Hospital Mortgage Insurance Act of 2003 (12 U.S.C. 1701) (collectively, the "<u>Act</u>"), that certain Mortgage Note and Allonge #1, both dated as of June 1, 2011 by

---

[4]    Mercy Hospital and Prudential agreed to reduce the original principal balance of the Construction Note from $32,810,000 to $29,280,600 as provided in that certain Allonge #2 to Construction Note dated June 1, 2014 (the "<u>Allonge #2</u>") executed by Mercy Hospital and Prudential and approved by HUD.

Mercy Hospital in favor of Prudential in the original principal amount of $32,810,000 (as amended, restated, supplemented, or otherwise modified, the "Refinance Note," and together with the Construction Note, the "Mortgage Notes") with a total sum of $32,810,000 approved for insurance thereunder by HUD on June 1, 2011 pursuant to the Act, that certain Mortgage dated as of June 1, 2011 (as amended by that certain Note and Modification Agreement (as defined below) and as further amended, restated, supplemented, or otherwise modified, the "Mortgage") entered into by Mercy Hospital in favor of Prudential, which incorporates the Regulatory Agreement (as defined in **Schedule 1** to this Final Order below), that certain Security Agreement dated as of June 1, 2011 (as amended by that certain Loan Modification Agreement (as defined below), and as further amended, restated, supplemented, or otherwise modified, the "Security Agreement") by and between Mercy Hospital and Mercy Foundation, Inc., an Illinois not-for-profit corporation ("Foundation"), and the Secured Parties, and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, account control agreements, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto, as each of the foregoing may have been modified, amended, amended and restated, or supplemented from time to time prior to the Petition Date (collectively the "Secured Party Loan Documents"). True and correct copies of certain of the Secured Party Loan Documents are maintained by Mercy Hospital and

the Secured Parties and will be made available to interested parties upon request.[5]

d.  The Secured Party Loan Documents are genuine, valid, existing, legally enforceable, and admissible in the Chapter 11 Cases for all purposes.

e.  <u>Defaults by the Debtors</u>.  The Debtors, Prudential, and HUD each reserve all of their rights with respect to whether Mercy Hospital is in default of its debts and obligations to the Secured Parties under the terms and provisions of the Secured Party Loan Documents.

f.  <u>The Secured Party Collateral</u>.  The Secured Parties' Claims evidenced by the Secured Party Loan Documents are secured by perfected first-priority liens and security interests in the real property and personal property collateral set forth in the Secured Party Loan Documents (collectively, the "<u>Secured Party Collateral</u>").  The Secured Parties' liens and security interests in the Secured Party Collateral were granted pursuant to, *inter alia*, the Secured Party Loan Documents.

g.  The Secured Parties properly perfected their first-priority liens and security interests and other liens in the applicable Secured Party Collateral as evidenced by, among other things, the Secured Party Loan Documents, documents held in possession of the Secured Parties, and documents filed with the appropriate state, county, and other offices.

---

[5]  The Secured Party Loan Documents include but are not limited to the Secured Party Loan Documents listed on **Schedule 1** attached hereto.

h. Secured Parties' Cash Collateral. All cash of each of Mercy Hospital's bankruptcy estate, wherever located, and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in Mercy Hospital's possession, custody or control, or in which Mercy Hospital will obtain an interest during the pendency of these Chapter 11 Cases, or which represent income, charges, proceeds, products, rents, or profits of any of the Secured Party Collateral shall constitute the cash collateral (collectively, "Cash Collateral") of the Secured Parties. The Secured Parties have first-priority perfected liens and security interests in the Cash Collateral pursuant to the applicable provisions of the Secured Party Loan Documents, sections 363(a) and 552(b) of the Bankruptcy Code, the Interim Order, and this Final Order. The Secured Parties do not consent to the Debtors' use of Cash Collateral except in strict accordance with the terms and conditions contained in this Final Order.

5. Authorization for Limited Use of Cash Collateral. Mercy Hospital is hereby authorized, on a limited basis, to use Cash Collateral only in strict accordance with the terms and conditions provided in this Final Order.

6. Cash Collateral Accounts. Mercy Hospital shall immediately, and shall continue to on a daily basis, segregate, remit, and deposit all Cash Collateral in each of Mercy Hospital's accounts, possession, custody, or control and which Mercy Hospital may receive in the future, in accordance with the applicable cash management order entered by this Court and as permitted or required by the Secured Party Loan Documents. The bank accounts of Mercy Hospital shall be

US 7772290v.21

only with Mercy Hospital's existing banks, or such other bank acceptable to the Secured Parties, subject to all existing depository and/or blocked account control agreements, unless otherwise agreed by the Secured Parties, and in the name of Mercy Hospital (individually or collectively, the "Cash Collateral Accounts").  Mercy Hospital shall be prohibited from withdrawing funds from their Cash Collateral Accounts except in strict compliance with the terms of this Final Order, the Budget, and the Secured Party Loan Documents.

7.      The proceeds from any sale of any of the Debtors' assets, any settlement, casualty, or condemnation proceeds relating to any of the Debtors' assets shall be paid, first, to the Secured Parties for application to the Secured Parties' Claims until such claims shall have been indefeasibly paid and satisfied in full.

8.      All funds transferred to the Secured Parties hereunder constitute Cash Collateral of the Secured Parties.  In the event that any funds so transferred are ever determined not to be Cash Collateral, the Secured Parties expressly reserve all rights and remedies in connection with any such determination.

9.      Adequate Protection.  As adequate protection of the Secured Parties' interests in the Secured Party Collateral, and for Mercy Hospital's use of the Secured Parties' Cash Collateral, the Secured Parties are hereby granted, effective as of the Petition Date, valid and automatically perfected first-priority replacement liens and security interests (the "Adequate Protection Liens") in and on  all real and personal property of Mercy Hospital's bankruptcy estate, including Cash Collateral, but excluding any of the Debtors' or the Debtors' estates' claims and causes of action arising under Sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any other similar state or federal law (the "Adequate Protection Collateral"), which shall secure any diminution in value of the Secured Parties' interests in the Secured Party Collateral and Mercy

US 7772290v.21

Hospital's use of Cash Collateral. The Adequate Protection Liens shall be subject to the Carve-Out (defined below). As additional adequate protection of the Secured Parties' interests in the Secured Party Collateral and for Mercy Hospital's use of Cash Collateral, provided that no timely-commenced Challenge (as defined below) shall have resulted in a final and non-appealable order against the Secured Parties which would not entitle the Secured Parties to such adequate protection, the Secured Parties shall receive from Mercy Hospital, from and after the Petition Date, no later than the first business day of each month, adequate protection payments in cash by wire transfer consisting of monthly payment of all principal, interest, real estate taxes, insurance (including any MIP premiums), required escrows, and reasonable fees, costs, and expenses, including reasonable attorneys' fees and related expenses (as reasonably documented in summary format), due or to be due to the Secured Parties under the Secured Party Loan Documents, including those that are incurred as a result of or are in any way related to the Chapter 11 Cases; *provided*, *however*, that the rights of all parties regarding application by Mercy Hospital's estate of such adequate protection payments as to principal, interest, and reasonable fees, costs, and expenses, including reasonable attorneys' fees and related expenses (excluding real estate taxes and insurance) shall be reserved such that such amounts shall be applied by Mercy Hospital's estate in a manner to be determined. Mercy Hospital's obligation to make such payments as adequate protection under this Final Order shall not alter or amend the Contract of Mortgage Insurance between the FHA Lender (Prudential) and HUD. Documentation for such fees, costs and expenses, including attorneys' fees and expenses, shall be served on the Debtors, the United States Trustee, and any committee appointed in these cases, including the Official Committee of Unsecured Creditors (the "Committee"). If no objection is made within 10 business days of such service then Mercy Hospital shall pay such fees, cost, and expenses, as applicable. If an objection is made, such

amount subject to objection shall not be paid without further order of the Court, and any amount not subject to objection shall be paid, and in each case, without the need for further application to or order of this Court. To the extent the Adequate Protections Liens are not sufficient to adequately protect the Secured Parties, the Secured Parties shall have priority claims under Section 507(b) of the Bankruptcy Code with priority as provided therein but subject to the Carve-Out. As further adequate protection of the Secured Parties, Prudential may conduct its servicing activities with the Debtors, and the automatic stay is modified to permit such servicing activities including tax and insurance reviews and the Debtors' compliance with its insurance, financial reporting, and other servicing and reporting requirements, and timely payment of required escrows and taxes and insurance from escrowed funds.

10. **Budgeted Cash Collateral Usage**. As adequate protection for Mercy Hospital's use of Cash Collateral, there shall be established a 13-week cash flow budget attached hereto as **Exhibit 1** (the "Budget") for the Debtors' cash receipts and expenses (including professional fees and expenses), which shall provide, among other things, for the payment of the Adequate Protection Payments. Any updates or revisions to the Budget shall require the prior written consent of the Secured Parties, and written notice of such updates or revisions shall be provided to the Committee and the United States Trustee. Only so long as a Postpetition Default (as defined below) shall not have occurred and remain outstanding at the end of the Default Notice Period (as defined below), Mercy Hospital is authorized to and may use Cash Collateral strictly in accordance with the Budget, subject to Permitted Variances and, solely with respect to Specified Contingencies (as defined below), application of funds from the Contingency Variance (as defined below). "Permitted Variances" shall mean, for any Testing Period (as defined in this paragraph), (i) any favorable variance, (ii) an unfavorable variance of not more than ten (10%) percent in

aggregate disbursements; *provided*, *however*, that professional fees of the Secured Parties paid by Mercy Hospital's bankruptcy estate as provided for hereunder shall not be subject to testing. Compliance with the Budget will be tested weekly on every Thursday on a rolling four (4) week basis (each, a "Testing Period"). If the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the Permitted Variances for such disbursements for the next succeeding periods shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by Mercy Hospital).

11.     The Secured Parties' consent to use of Cash Collateral extends only to amounts actually incurred in accordance with the Budget, subject to the Permitted Variances and, as applicable, the Contingency Variance. Following the expiration of any Default Notice Period or entry of an order of this Court as set forth in Paragraph 18 hereof, the Secured Parties' consent to use of Cash Collateral shall automatically and immediately terminate and any consent for use of Cash Collateral to satisfy projected, budgeted expenditures shall be immediately terminated and deemed withdrawn as set forth below unless such Postpetition Default is cured by the Debtors during the Default Notice Period or otherwise waived by the Secured Parties.

12.     Except as may specifically be provided in the Budget including, without limitation, for ordinary course payroll, benefits, and expense reimbursements, the Debtors agree that no transfer of Cash Collateral shall be made to any of the Debtors' insiders, as that term is defined in section 101(31) of the Bankruptcy Code. Any transfers to insiders shall be so identified in the Budget.

13.     The Budget may be modified in writing only with the prior written consent of Prudential and HUD, and notice of any such modifications shall be provided to the Committee.

US 7772290v.21

14.    <u>Contingency Variance</u>.  There shall be established a contingency variance (the "<u>Contingency Variance</u>") in the aggregate amount of $[$1,500,000][6] to fund potential shortfalls in the Budget, solely with respect to the following line items (each of the following a "<u>Specified Contingency</u>"):    (a) payroll for employees of Mercy Hospital;  (b) supplies;  (c) medical professional fees consisting of payments to medical personnel who are not employees of Mercy Hospital but with whom Mercy Hospital has certain contractual arrangements; and (d) other purchases as set forth in the Budget.  The Contingency Variance shall be reduced dollar-for-dollar for each expenditure made from the Contingency Variance, and such amounts shall not be replenished from Cash Collateral without the prior written consent of the Secured Parties.  The Debtors shall provide a notice of intent to utilize the Contingency Variance to the Secured Parties and the Committee at least two (2) business days prior to such use, such notice shall include detail as to the amount and justification regarding each Specified Contingency of such use.  The Secured Parties reserve all rights in connection with any use of same, including the right to seek expedited relief and adequate protection from the Bankruptcy Court.

15.    <u>Reporting</u>.  On or before Tuesday of each week, the Debtors shall deliver to Prudential, HUD, and the Committee, directly or through counsel, (a) a weekly update and reconciliation report in form and substance acceptable to the Secured Parties (a "<u>Budget Report</u>") showing variances of Budget amounts to actual amounts, detailing Mercy Hospital's receipts and disbursements for the previous calendar week, providing a comparison to the amounts set forth in the Budget therefor for such week (on an aggregate and a line item by line item basis in the case of disbursements), and showing any amounts applied from the Contingency Variance; (b) weekly census/admissions data and monthly financial reporting; (c) any information or documents

---

[6] This amount remains subject to final agreement by the parties.

Prudential and/or HUD are authorized to request under the applicable loan documents; and (d) such other information and documents relating to Cash Collateral as either Secured Party shall reasonably request. After the sixth (6th) Budget Report, the Debtors will provide a new 13-week Budget for approval by the Secured Parties, with notice to the Committee and the United States Trustee.

16. <u>No Additional Liens</u>. Until such time as the Secured Parties' Claims shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Secured Party Loan Documents, Mercy Hospital shall not be authorized to obtain credit secured by a lien or security interest in any of their property without the prior written consent of the Secured Parties or by order of the Court upon reasonable notice.

17. <u>Postpetition Defaults</u>. The occurrence of any of the following shall constitute a Postpetition Default by Mercy Hospital under this Final Order upon notice to the Debtors: (a) any default, violation, or breach by any of the Debtors of any of the terms of this Final Order or any of the Secured Party Loan Documents; (b) the occurrence of the Expiration Date, maturity, termination, expiration, or non-renewal of this Final Order as provided for herein; (c) the Debtors shall fail to pay any Adequate Protection Payment when the same becomes due and payable or any of the other adequate protection granted to the Secured Parties pursuant to this Final Order shall cease to adequately protect the interests of the Secured Parties in the Secured Party Collateral; (d) any security interest, lien, claim, or encumbrance shall be granted in any of the Secured Party Collateral which is *pari passu* with or senior to the liens, security interests, or claims of the Secured Parties; (e) the Debtors shall fail to provide a Budget Report as required under this Final Order; (f) the entry of an order granting relief from the Automatic Stay to the holder or holders of any other security interest or lien (other than the Secured Parties) in any Secured Party Collateral to

US 7772290v.21

permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Secured Party Collateral, in each case involving assets with a value in excess of $75,000; (g) any challenge to the extent, validity, priority, or unavoidability of the liens securing the Secured Parties' Claims is commenced by the Debtors or an order is entered sustaining any such challenge commenced by any party other than the Debtors; (h) any of these Chapter 11 Cases shall be dismissed (or sought to be dismissed on terms that are not acceptable to the Secured Parties, and all rights of the Secured Parties to object to such dismissal are expressly reserved) or converted to a case under chapter 7 of the Bankruptcy Code; (i) the appointment of a trustee or examiner (with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors) in any of these Chapter 11 Cases; (j) the Debtors shall attempt to vacate or modify this Final Order over the objection of Prudential or HUD; (k) the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of a material portion of the Debtors' assets absent the consent of Prudential and HUD to the extent such sale would breach or violate any law, rule, regulatory requirement, or the Regulatory Agreement, or violate the "Lockout" provisions under the Secured Party Loan Documents, and all rights of the Secured Parties to object to such sale are expressly reserved, (l) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending this Final Order; or (m) the filing or confirmation of a plan of reorganization that is not acceptable to the Secured Parties in the treatment of the claims arising in connection with the Secured Parties' Claims to the extent such plan of reorganization would breach or violate any law, rule, regulatory requirement, or the Regulatory Agreement, or violate the "Lockout" provisions under the Secured Party Loan Documents, and all rights of the Secured Parties to object to such plan of reorganization are expressly reserved (any of the foregoing postpetition defaults

US 7772290v.21

being referred to in this Final Order, individually, as a "<u>Postpetition Default</u>", and collectively, as "<u>Postpetition Defaults</u>").

18.     <u>Remedies</u>.   The Secured Parties shall provide the Debtors, their counsel, the Committee, and the United States Trustee written notice of any Postpetition Default (a "<u>Default Notice</u>").  Unless the Debtors have cured the Postpetition Default(s) specified in the Default Notice on or before the fifth (5th) business day after delivery of a Default Notice to the Debtors (the "<u>Default Notice Period</u>"), without requiring further order from the Court, and without the need for filing any motion for relief from the automatic stay or any other pleading, Mercy Hospital's authority to use Cash Collateral shall terminate at 11:59 p.m. prevailing Central Time on the last day of the Default Notice Period; *provided* that during the Default Notice Period, the Debtors, the Committee, and/or the Secured Parties may seek an emergency hearing before this Court, and must provide prompt notice of such hearing to the other parties, to contest whether a Postpetition Default has occurred and/or seek authorization to continue to use Cash Collateral; and *provided further* that Mercy Hospital shall be authorized to continue using Cash Collateral, solely in accordance with the Budget (including the Permitted Variances and the Contingency Variance), during any Default Notice Period or, if a motion is filed with the Court and the moving party uses best efforts to obtain an emergency setting to contest whether a Postpetition Default has occurred and/or seek authorization to continue to use Cash Collateral, until the Court enters an order with respect to such motion.

19.     Furthermore, upon the occurrence and during the continuation of any Postpetition Default, the Secured Parties are hereby authorized to file a motion on shortened notice of no less than 5 business days seeking relief from the automatic stay (a "<u>Stay Relief Motion</u>") in order to permit the Secured Parties to exercise any or all of their other rights and remedies set forth in this

Final Order or the Secured Party Loan Documents, pursuant to and subject to the terms and provisions of this Final Order. Notwithstanding the occurrence of a Postpetition Default, all of the rights, remedies, benefits, and protections provided to the Secured Parties under this Final Order shall survive.

20. After the conclusion of any Default Notice Period, the Secured Parties may consent to Mercy Hospital's use of Cash Collateral, and such consent to use of Cash Collateral (a) shall not constitute a waiver, limitation, or modification of the Secured Parties' rights and remedies pursuant to the Secured Party Loan Documents, this Final Order, and applicable law and (b) shall be and hereby are granted all of the protections granted to the Secured Parties under this Final Order in connection with the use of Cash Collateral.

21. <u>Fees and Expenses of Estate Professionals; Carve-Out</u>. The Debtors shall be deemed to first use any unencumbered cash they may have, if any; further, the Secured Parties' liens on the Secured Party Collateral and the Adequate Protection Liens will be subject to: (a) the payment of unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) to the extent (i) provided for in the Budget, and (ii) allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Estate Professionals</u>") at any time before the delivery by Prudential of a Carve-Out Trigger Notice (as defined below); and (c) Allowed Professional Fees of all Estate Professionals in an aggregate amount, after application of all retainers, not to exceed $100,000 incurred on or after the first

business day following delivery by Prudential of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (such amount, the "Post-Carve-Out Trigger Notice Cap") (the foregoing clauses (a) through (c), collectively, the "Carve-Out").  The Term "Carve-Out Trigger Notice" shall mean a written notice stating that the Post-Carve-Out Trigger Notice Cap has been invoked, delivered by hard copy or email by Prudential to lead bankruptcy counsel for the Debtors, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and continued existence of a Postpetition Default under the terms of this Final Order.

22.     Any payment or reimbursement made to any Estate Professional in respect of any Allowed Professional Fees earned prior to the delivery of the Carve-Out Trigger Notice shall not reduce the Post-Carve-Out Trigger Notice Cap; *provided*, *however*, that no amounts paid prior to any Postpetition Default or under the Carve-Out shall be used to pay for Allowed Professional Fees with respect to the Proscribed Actions (as defined below).  Any payment or reimbursement made to any Estate Professional in respect of any Allowed Professional Fees earned after delivery of the Carve-Out Trigger Notice shall reduce the Post-Carve-Out Trigger Notice Cap dollar-for-dollar.

23.     Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of each Estate Professional. Mercy Hospital shall be permitted to pay compensation and reimbursement of expenses incurred prior to the occurrence of a Postpetition Default in accordance with the Budget and allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable. Other than the Carve-Out set forth above, the Secured Parties do not consent to any carve-out from

the Secured Party Collateral or the Adequate Protection Collateral for payment of any fees and expenses of the Estate Professionals.

24.     Until such time as the Secured Parties' Claims shall have been indefeasibly paid and satisfied in full in accordance with the Secured Party Loan Documents, any remaining unapplied retainer funds at the conclusion of an Estate Professional's engagement shall be immediately returned to the Secured Parties as the Secured Parties' Cash Collateral.  The Secured Parties expressly retain the right to object to any fees or expenses of any Estate Professional as to reasonableness or on any other grounds.

25.     <u>Excluded Professional Fees</u>.  Notwithstanding anything to the contrary in this Final Order, but except as set forth in this Paragraph 25 of this Final Order, and irrespective of the Carve-Out, in no event shall Cash Collateral, the Carve-Out, or the proceeds of any loans, advances, or other funds made available by the Secured Parties to or for the benefit of the Debtors be used for the payment or reimbursement of any fees, expenses, costs or disbursements of any Estate Professional or other persons incurred with the purpose of:  (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Secured Parties' Claims, the Secured Party Loan Documents, this Final Order, or any liens or security interests granted thereby or with respect thereto, (b) investigating, asserting, prosecuting, or the joinder in any claims or causes of action against the Secured Parties or any of their officers, directors, employees, affiliates, agents, attorneys, or equity holders, including without limitation, any actions under chapter 5 of the Bankruptcy Code (whether arising under state law, the Bankruptcy Code, or any other federal or foreign law); (c) preventing, enjoining, hindering, or otherwise delaying the Secured Parties' enforcement of the Secured Party Loan Documents or this Final Order, except as set forth in Paragraph 18 of this Final Order, or any realization upon any

US 7772290v.21

Secured Party Collateral or Adequate Protection Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any Secured Party Loan Document or this Final Order); (d) incurring indebtedness except as permitted by this Final Order; (e) modifying any Secured Parties' rights under any Secured Party Loan Documents or this Final Order without the applicable Secured Party's consent in its determination; (f) asserting or declaring any liens or security interests granted under any of the Secured Party Loan Documents or this Final Order to have a priority other than the priority set forth herein or therein; (g) asserting, prosecuting or the joinder in, any action or other proceeding seeking to grant a lien or security interest senior to, or on parity with, the liens and security interests of the Secured Parties in the Secured Party Collateral or any portion thereof without the Secured Parties' consent in their determination; (h) asserting or declaring any of the Secured Party Loan Documents or this Final Order to be invalid, not binding or unenforceable in any respect; or (i) using Cash Collateral or selling any Secured Party Collateral or Adequate Protection Collateral to the extent such sale would breach or violate any law, rule, regulatory requirement, or the Regulatory Agreement, or violate the "Lockout" provisions under the Secured Party Loan Documents, except as specifically permitted in the Secured Party Loan Documents or this Final Order, and all rights of the Secured Parties to object to such sale are expressly reserved (collectively, the "Proscribed Actions").  Notwithstanding the foregoing, Cash Collateral may be used to pay the fees earned and expenses incurred of counsel to any Committee in an amount not to exceed $35,000 (the "Investigation Budget") in connection with the investigation of, but not the litigation, objection, or any challenge to, the Secured Parties' Claims, the Secured Party Loan Documents, any liens or security interests granted thereby and any other potential claims or causes of action against the Secured Parties.

US 7772290v.21

26.     <u>Challenge Procedures.</u>     The stipulations contained in this Final Order shall be binding upon the Debtors, the Committee, and all other parties in interest for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entities' right or ability to do so) has properly commenced an adversary proceeding or contested matter, including but not limited to a motion seeking standing to prosecute an adversary proceeding on behalf of the Debtors' estates and, if such motion is granted, actually commenced an adversary proceeding or contested matter with respect to all matters being challenged within five (5) business days after the Court enters an order granting such motion (such motion and adversary proceeding, collectively, a "<u>Challenge</u>") by no later than sixty (60) days from the date of entry of this Final Order (such applicable period of time, the "<u>Challenge Deadline</u>"), (x) challenging the extent, priority, validity, perfection, amount, or allowability of the Secured Party Loan Documents or the Secured Parties' security interests in and liens upon the Secured Party Collateral, or (y) otherwise asserting any claims or causes of action against the Secured Parties on behalf of the Debtors' estates; and (2) the Court rules in favor of the plaintiff or movant in any such timely and properly filed Challenge.  If such a Challenge is properly commenced on or before the Challenge Deadline, the Challenge Deadline solely with respect to the party(ies) asserting such a Challenge shall be tolled until entry of a final order or judgment that is no longer subject to any appeal rights or further proceedings (a "<u>Final Challenge Order</u>").  If no such Challenge is properly filed by the Challenge Deadline or a Final Challenge Order has been entered against the plaintiff or movant in any such proceeding, then: (a) the stipulations and releases contained in this Final Order shall be binding on all parties in interest, including the Committee; (b) the obligations of Mercy Hospital under the Secured Party Loan Documents shall constitute allowed claims for all purposes in these Chapter 11 Cases, and any subsequent chapter 7 case(s);

(c) the Secured Parties' security interests in and liens upon the Secured Party Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, perfected, first-priority security interests and liens, not subject to recharacterization, subordination (except to the extent permitted in this Final Order) or otherwise avoidable; and (d) the Secured Parties' Claims and the Secured Parties' security interests in and liens on the Secured Party Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. If any such Challenge is properly filed prior to the Challenge Deadline, the stipulations contained in this Final Order shall remain binding and preclusive (i) on any party who did not file such Challenge and (ii) as to any party who did file such Challenge, except to the extent that such stipulations were expressly challenged in such Challenge; *provided*, *however*, that all such stipulations shall be subject to the terms of any Final Challenge Order. Nothing contained in this Final Order shall be deemed to grant standing to any party to commence any such adversary proceeding or contested matter.

27. <u>No Liability</u>. No act committed or action taken by the Secured Parties under this Final Order, the Secured Party Loan Documents, or the collection of the Secured Parties' Claims, shall be used, construed, or deemed to hold the Secured Parties, as applicable, to be in "control" of or participating in the governance, management, or operations of the Debtors for any purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of the Debtors or their businesses (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute,

22

at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the Secured Parties under the Secured Party Loan Documents or this Final Order including, without limitation, such rights and remedies as may be exercisable by the Secured Parties in connection with this Final Order.

28. <u>No Priority Claims</u>. Other than the Carve-Out, no priority claims shall be allowed that are or will be prior to or on parity with the secured claims or the Adequate Protection Superpriority Claims of the Secured Parties against the Debtors and their estates arising from the Secured Party Loan Documents and this Final Order.

29. <u>Sale of Secured Party Collateral</u>. Except for the reasonable and necessary sale of inventory in the ordinary course of the Debtors' business and as may be provided for in the Budget and consistent with the terms of the Secured Party Loan Documents and this Final Order, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Secured Party Collateral without the prior written consent of the Secured Parties to the extent such sale would breach or violate any law, rule, regulatory requirement, or the Regulatory Agreement, or violate the "Lockout" provisions under the Secured Party Loan Documents, and all rights of the Secured Parties to object to such sale are expressly reserved.

30. <u>No Modification</u>. The terms hereunder, the security interests and liens granted to the Secured Parties under this Final Order, and the rights of the Secured Parties pursuant to this Final Order with respect to the Secured Party Collateral, and treatment of the Secured Parties' Claims shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors without the prior written approval of the Secured Parties or as otherwise ordered by the Court; *provided* that any such order of the Court shall not modify any relief set forth herein until the day after the such order shall have become final and non-appealable.

US 7772290v.21

31.     If any or all of the provisions of this Final Order are hereafter modified, vacated, or stayed without the prior written agreement of the Secured Parties, such modification, vacation, or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the Secured Parties before the effective date of such modification, vacation, or stay or (b) the validity or enforceability of any security interest, lien, priority or other protection authorized, granted, or created hereby or pursuant to this Final Order. Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtors to the Secured Parties before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Final Order, and the Secured Parties shall be entitled to all the liens, rights, remedies, privileges, and benefits granted herein with respect to all such indebtedness, obligations, or liabilities.

32.     Survival.  The terms and provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting to chapter 7 or dismissing these Chapter 11 Cases, except for Mercy Hospital's authority to use Cash Collateral (all of which shall immediately terminate upon entry of such an order).  The terms and provisions of this Final Order, as well as the priorities in payment, liens, and security interests granted pursuant to this Final Order, shall continue in these Chapter 11 Cases and any subsequent chapter 7 cases upon conversion of these Chapter 11 Cases, if applicable, and following any dismissal of Cases or cases, as applicable, and such priorities in payment, liens, and security interests shall maintain their priority as provided by this Final Order until such time as the Secured Parties' Claims shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Secured Party Loan Documents and the Secured Parties shall have no further obligation or financial accommodation to the Debtors.

US 7772290v.21

33.    Other Terms.  No approval, agreement, or consent requested of the Secured Parties by the Debtors pursuant to the terms of this Final Order or otherwise shall be inferred from any action, inaction, or acquiescence of the Secured Parties other than a writing acceptable to the Secured Parties that is signed by the Secured Parties and expressly shows such approval, agreement or consent, without limitation.  Nothing herein shall in any way affect the rights of the Secured Parties as to any non-Debtor entity, without limitation.  Except as expressly and contrarily set forth herein, any determination, agreement, decision, consent, election, approval, acceptance, waiver, designation, authorization, or other similar circumstance or matter of or by the Secured Parties hereunder or related hereto, without limitation, shall be in the Secured Parties' sole discretion.

34.    Nothing herein shall be deemed or construed to waive, limit, or modify the rights of the Secured Parties to obtain further adequate protection and other statutory protections for the use of the Secured Party Collateral, including Cash Collateral, or to seek other relief in these Chapter 11 Cases in accordance with any provision of the Bankruptcy Code or applicable law. Nothing herein or in the Motion shall or shall be deemed to waive, modify, or limit any rights and remedies of the Secured Parties with respect to any claims, causes of action, interests in property, or other similar rights against the Debtors or any other entity, and all such rights and remedies are hereby reserved.

35.    Nothing in this Final Order, the Motion or any related agreements shall modify any right of the United States Department of Health and Human Services ("HHS") and its component HHS agencies, including, but not limited to the Centers for Medicare & Medicaid Services ("CMS") and the Health Resources and Services Administration ("HRSA"), to regulate and enforce compliance with HHS statutes and regulations, including, but not limited to, such agencies' rights to take any actions to help protect health and safety. Nothing in this Final Order,

25

the Motion, or any related agreements shall affect or impair any defenses (jurisdictional or otherwise), reductions, recoupment or counterclaims by HHS, HRSA, or CMS, or modify any right of HHS and CMS to administer Medicare agreements in accordance with federal law.

36. Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify or prejudice the claims, rights, protections, privileges and defenses of the Secured Parties afforded pursuant to the Bankruptcy Code.

37. All headings in this Final Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

38. Notice. The Debtors' proposed counsel shall serve this Final Order on all of the following parties: (a) the Office of the United States Trustee; (b) the attorneys for Prudential; (c) the attorneys for HUD; (d) all creditors known to the Debtors who have or may assert liens against any of the Debtors' assets; (e) the United States Internal Revenue Service; (f) the Committee; and (g) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Bankruptcy Rules or the Local Bankruptcy Rules.

39. Expiration Date/Maturity. The Secured Parties' consent and Debtors' authority to use Cash Collateral, subject to the funding and Budget limitations above, shall be effective upon entry of this Final Order to and including the earlier of: (a) expiration of any Default Notice Period or entry of an order of the Court in accordance with Paragraph 18 hereof, as applicable, or (b) May 15, 2021, 2021, at 5:00 p.m. Central Time, at which time all of Mercy Hospital's authority to use Cash Collateral shall terminate, unless extended by written agreement of the parties hereto, a copy of which with an updated Budget shall be promptly filed with this Court by the Debtors, or further order of the Court (the "Expiration Date").

US 7772290v.21

40. <u>Continuation of Pre-Petition Procedures</u>. In accordance with this Court's order authorizing the Debtors' continued use of their cash management system, all pre-petition cash management practices and procedures of the Debtors, including any lockbox and/or blocked depository bank account arrangements, shall continue without interruption after the commencement of the Chapter 11 Cases.

41. <u>Modification of Automatic Stay</u>. The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified and lifted to the extent necessary to implement the provisions of this Final Order, as and to the extent authorized by this Final Order.

42. <u>Binding Effect; Successors and Assigns</u>. The provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the Debtors and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of Prudential, HUD, and each of their respective successors and assigns. Any rights of any party that did not receive notice of either the Motion, the Interim Order, the proposed Final Order, or the Final Hearing are reserved, and any rights of all other parties to contest or dispute the assertion of such rights are also reserved.

43. <u>Effectiveness; Enforceability</u>. This Final Order shall take effect and be fully enforceable retroactively to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be

valid, take full effect, and be enforceable immediately upon entry hereof. There shall be no stay of execution or effectiveness of this Final Order, and any stay of the effectiveness of this Final Order that might otherwise apply is hereby waived for cause shown.


Dated: _____


_____
HON. TIMOTHY A. BARNES
UNITED STATES BANKRUPTCY JUDGE


Prepared by:

Edward J. Green (#6225069)
Matthew J. Stockl (#6304087)
Jasmine Reed (#310730)
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
egreen@foley.com
mstockl@foley.com
jreed@foley.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

US 7772290v.21

# SCHEDULE 1[7]

## SCHEDULE OF CERTAIN SECURED PARTY LOAN DOCUMENTS

1. The Construction Note.

2. The Refinance Note.

3. Mortgage, dated as of June 1, 2011, between Mercy Hospital and Medical Center, a not-for-profit corporation organized and existing under the laws of the State of Illinois ("Mortgagor") and Prudential Huntoon Paige Associates, Ltd., a corporation organized and existing under the laws of the State of Delaware ("Mortgagee") and recorded in the Cook County Recorder of Deeds office on June 8, 2011 as Document No.: 1115922059 as amended by that certain Note and Mortgage Modification Agreement, dated as of June 1, 2014 (the "Note and Modification Agreement"), by and between Mortgagor and Mortgagee, and acknowledged and approved by the Federal Housing Commissioner acting under the supervision and direction of the Secretary of Housing and Urban Development (together in such capacity, the "Secretary") and recorded in the Cook County Recorder of Deeds office on June 30, 2014 as Document No.: 1418116025.

4. The Security Agreement.

5. Loan Modification Agreement, dated as of June 1, 2014 (the "Loan Modification Agreement"), by and between Mortgagor, Foundation, , and Mortgagee, and acknowledged and approved by the Secretary.

6. Amended and Restated Guaranty Agreement, dated as of June 30, 2014, made by Trinity, in favor of the Secretary.

7. Blocked Account Control Agreement ("Shifting Control") dated as of June 7, 2011 by and among Mercy Hospital, as Company, Prudential, as Lender, and JPMorgan Chase Bank, N.A., as Depository covering Account Nos.: *****82, *****16, ******22, and ******05, as amended by that certain Amendment to Blocked Account Control Agreement ("Shifting Control") dated as of June 30, 2014 by and among Mercy Hospital, as Company, Prudential, as Lender, and JPMorgan Chase Bank, N.A., as Depository, amending and restating the covered Account Nos. to list: *****82, ******16, ******22, and ******05.

8. Blocked Account Control Agreement ("Shifting Control") dated as of June 7, 2011 by and among Mercy Hospital, as Company, Prudential, as Lender, and Lakeside Bank, as Depository covering Account No.: *******01

9. Blocked Account Control Agreement ("Shifting Control") dated as of June 7, 2011 by and among Foundation, as Company, Prudential, as Lender, and JPMorgan Chase Bank, N.A., as Depository covering Account Nos.: ******39, ******11, and ******54 as amended by that certain Amendment to Blocked Account Control Agreement ("Shifting Control") dated as of June 30, 2014 by and among Foundation, as Company, Prudential, as Lender, and JPMorgan Chase Bank, N.A., as Depository, amending and restating the covered Account Nos. to list: ******39 and ******54.

---

[7] This schedule may not include all relevant and applicable documents. It is the intent of the parties that all relevant and applicable documents may be utilized by the Secured Parties for any purpose irrespective of whether such documents are expressly listed on this schedule.

10. Blocked Account Control Agreement ("Shifting Control") dated as of June 1, 2011 by and among Foundation, as Company, Prudential, as Lender, and TCF National Bank, as Depository covering Account No.: \*\*\*\*\*\*49.

11. Blocked Account Control Agreement ("Shifting Control") dated as of June 7, 2011 by and among Foundation, as Company, Prudential, as Lender, and Lakeside Bank, as Depository covering Account Nos.: \*\*\*\*\*00, \*\*\*\*\*\*14, \*\*\*\*\*\*50, \*\*\*\*\*\*\*\*\*01, \*\*\*\*\*\*\*\*\*01, and \*\*\*\*\*\*\*\*02 as amended by that certain Amendment to Blocked Account Control Agreement ("Shifting Control") dated as of June 30, 2014 by and among Foundation, as Company, Prudential, as Lender, and Lakeside Bank, as Depository, amending and restating the covered Account Nos. to list: \*\*\*\*\*00, \*\*\*\*\*\*14, \*\*\*\*\*\*50, \*\*\*\*\*\*\*\*\*01, \*\*\*\*\*\*\*\*02, \*\*\*\*\*\*\*\*\*01, and \*\*\*\*\*\*88.

12. Blocked Account Control Agreement ("Automatic Sweep / Frozen Account") dated as of June 7, 2011 by and among Mortgagor, as Company, Prudential, as Lender, and JPMorgan Chase Bank N.A., as Depository covering Account No.: \*\*\*\*\*30 and providing for daily sweep into Account No.: \*\*\*\*\*\*82.

13. Blocked Account Control Agreement ("Shifting Control") dated as of June 30, 2014 by and among Foundation, as Company, Prudential, as Lender, and Popular Community Bank, as Depository covering Account No.: \*\*\*\*\*\*92.

14. Regulatory Agreement, dated as of June 1, 2011, including Rider I and Rider II also dated June 1, 2011 between Mortgagor and the Secretary and recorded in the Cook County Recorder of Deeds office on June 8, 2011 as Document No.: 1115922060, as modified by that certain Rider III dated August 30, 2013 between Mercy Hospital and the Secretary and recorded in the Cook County Recorder of Deeds office on February 18, 2014 as Document No.: 1404910097 and as amended by that certain Regulatory Agreement Amendment, dated as of June 1, 2014, between Mortgagor and the Secretary and recorded in the Cook County Recorder of Deeds office on June 30, 2014 as Document No.: 1418116026. (the "Regulatory Agreement").

15. The Commitment.

16. Building Loan Agreement dated as of June 1, 2011, between Mortgagor and Mortgagee.

17. MRF Trust Fund Agreement dated as of June 1, 2011 between Mercy Hospital, the Secretary and Prudential.

18. Mortgage Reserve Fund Agreement dated as of June 1, 2011 between Mercy Hospital and the Secretary.

19. Mortgagee's Certificate dated as of June 7, 2011 by Mortgagee.

20. UCC-1 Financing Statement listing Mercy Hospital and Foundation, as Debtors, and Prudential and HUD, as Secured Parties and recorded on June 9, 2011 as Instrument No.: 16338745 in the Office of the Secretary of State of Illinois, as continued by Instrument No.: 0093888170 recorded on December 10, 2015 in the Office of the Secretary of State of Illinois, as amended by Instrument No.: 009506931 recorded on October 19, 2017 in the Office of the Secretary of State of Illinois and as continued by Instrument No.: 009718411 recorded on January 11, 2021 in the Office of the Secretary of State of Illinois.

# EXHIBIT 1

## BUDGET

**Mercy Hospital & Medical Center**
**Mercy Chicago - Cash Collateral Budget 8**
**Weeks**
*Dollars in thousands*

| | Month April | Week 1 5-Apr | Week 2 12-Apr | Week 3 19-Apr | Week 4 26-Apr | 4 Week Total | Month May | Week 5 3-May | Week 6 10-May | Week 7 17-May | Week 8 24-May | 4 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | |
| Patient Collections | $ 7,300 | $ 1,825 | $ 1,825 | $ 1,825 | $ 1,825 | $ 7,300 | $ 7,300 | $ 1,825 | $ 1,825 | $ 1,825 | $ 1,825 | 7,300 |
| Hospital Assessment Receipts | 4,000 | 4,000 | - | - | - | 4,000 | 4,000 | 4,000 | - | - | - | 4,000 |
| Other Revenue Collections | 70 | - | 20 | 40 | 10 | 70 | 70 | - | 20 | 40 | 10 | 70 |
| **Total operating revenue** | $ 11,370 | $ 5,825 | $ 1,845 | $ 1,865 | $ 1,835 | $ 11,370 | $ 11,370 | $ 5,825 | $ 1,845 | $ 1,865 | $ 1,835 | 11,370 |
| | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | |
| Gross payroll | $ 6,600 | $ 3,300 | $ - | $ 3,300 | $ - | $ 6,600 | $ 6,600 | $ 3,300 | $ - | $ 3,300 | $ - | 6,600 |
| Other employee benefits | 1,000 | 25 | 20 | 25 | 930 | 1,000 | 1,000 | 25 | 20 | 25 | 930 | 1,000 |
| Contract labor, total | 700 | 175 | 175 | 175 | 175 | 700 | 700 | 175 | 175 | 175 | 175 | 700 |
| Total labor expenses | $ 8,300 | $ 3,500 | $ 195 | $ 3,500 | $ 1,105 | 8,300 | $ 8,300 | $ 3,500 | $ 195 | $ 3,500 | $ 1,105 | 8,300 |
| Supplies | 1,700 | 425 | 425 | 425 | 425 | 1,700 | 1,700 | 425 | 425 | 425 | 425 | 1,700 |
| Medical and professional fees | 1,000 | 250 | 250 | 250 | 250 | 1,000 | 1,000 | 250 | 250 | 250 | 250 | 1,000 |
| Shared Services | 2,477 | 0 | 0 | 2,477 | 0 | 2,477 | 2,477 | 0 | 0 | 2,477 | 0 | 2,477 |
| HUD Loan | 210 | 0 | 0 | 0 | 210 | 210 | 210 | 0 | 0 | 0 | 210 | 210 |
| Insurance | 885 | 0 | 0 | 0 | 885 | 885 | 885 | 0 | 0 | 0 | 885 | 885 |
| Provider Tax | 1,103 | 0 | 0 | 1,103 | 0 | 1,103 | 1,103 | 0 | 0 | 1,103 | 0 | 1,103 |
| Other purchased services & expenses | 2,500 | 625 | 625 | 625 | 625 | 2,500 | 2,500 | 625 | 625 | 625 | 625 | 2,500 |
| Epiq fees and expenses | 55 | 13.75 | 13.75 | 13.75 | 13.75 | 55 | 28 | 7 | 7 | 7 | 7 | 28 |
| Committee's Professionals | 100 | 25 | 25 | 25 | 25 | 100 | 100 | 25 | 25 | 25 | 25 | 100 |
| Debtors' Professionals | 250 | 62.5 | 62.5 | 62.5 | 62.5 | 250 | 250 | 62.5 | 62.5 | 62.5 | 62.5 | 250.0 |
| Patient Care Ombudsman | 37.5 | 9.375 | 9.375 | 9.375 | 9.375 | 37.5 | 37.5 | 9.375 | 9.375 | 9.375 | 9.375 | 37.5 |
| PCO's Professionals | 7.5 | 1.875 | 1.875 | 1.875 | 1.875 | 7.5 | 7.5 | 1.875 | 1.875 | 1.875 | 1.875 | 7.5 |
| **Total operating expenses** | $ 18,625 | $ 4,913 | $ 1,608 | $ 8,493 | $ 3,613 | $ 18,625 | $ 18,598 | $ 4,906 | $ 1,601 | $ 8,486 | $ 3,606 | 18,175 |
| | | | | | | | | | | | | |
| **Cash Outflow** | $ (7,255) | $ 913 | $ 238 | $ (6,628) | $ (1,778) | $ (7,255) | $ (7,228) | $ 919 | $ 244 | $ (6,621) | $ (1,771) | (6,805) |